May 22, 1979

**79-35    MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL**

**Right to Financial Privacy Act of 1978 (12 U.S.C. § 3401)—Banks—Disclosure of Customer Financial Records**

This responds to your request for our opinion of April 30 on the following questions concerning the Right to Financial Privacy Act (Act):[1]

(1) To what extent does the Act affect the ability of a bank supervisory agency to report to the Department of Justice violations of the law that it uncovers?

(2) What kinds of information may be included as part of the notification that is explicitly permitted banks under § 1113(h)(5) (12 U.S.C. § 3413) or that may be impliedly permitted bank supervisory agencies?

(3) What is the interplay of § 1112 (12 U.S.C. § 3412) of the Act and the ability of bank supervisory agencies to notify the Department of possible offenses without giving notice to customers?

These issues arise because of the restrictions the Act has placed on Federal agencies' access to and dissemination of the financial records of bank customers.[2]

Our conclusions may be summarized as follows: first, a report that a customer's financial records may relate to a criminal offense, when based on a summary or analysis of the records, is itself a "financial record" within the meaning of § 1102(2); second, with the exception of § 1113(h),

---

[1] The Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.*, was enacted as Title XI of the Financial Institutions Regulatory Act of 1978, Pub. L. No. 95–630, 92 Stat. 3697. The section references in this opinion are to those in title XI.

[2] In § 1101(4)–(5) of the Act, a "customer" means an individual or a partnership of five or fewer individuals, who used or is using any service of a financial institution. The financial records of corporations, larger partnerships, or other legal entities are not covered and access to such records is not affected.

the procedures in § 1112 are the only ones expressly provided for a supervisory agency to make such a report to a law enforcement agency; third, notwithstanding § 1112, implied authority for a bank supervisory agency to make such a report exists in a narrow class of cases, namely, possible violations of criminal statutes that are part of the regulatory system enforced by the supervisory agency; fourth, the report of possible criminal offenses expressly permitted by §§ 1103(c) and 1113(h)(5), and impliedly permitted for "regulatory" crimes, may be specific enough to permit the law enforcement agency to request the primary records but may not be so detailed as to amount to a transfer of the substance of the original records.

We are informed by your staff that the background to your request is as follows. Before the enactment of the Act, a supervisory agency routinely inspected customer records in the course of examining the financial institutions under its charge.[3] When this led the agency to believe that a Federal offense might have been committed by the customer or others, it would report to the proper Federal enforcement agency. The report would begin with a summary of the reasons for believing that an offense had been committed and would proceed with a detailed analysis of the supporting customer records involved. The offenses tended to fall into two groups. The first involved misuse of authority by an officer or employee of the financial institution, whether or not in concert with a customer.[4] The second involved offenses not related to the management of the institution. We are informed that referrals by supervisory agencies of offenses not involving the financial institution were rare. Accordingly, this opinion will focus on the authority of the supervisory agencies to notify law enforcement agencies of offenses affecting the financial institution and the authority of the law enforcement agencies to receive such referrals.

The extent to which the Act affects the ability of a bank supervisory agency to report violations to the Department of Justice depends on four factors: the ability of the supervisory agency to report before the Act was passed; the Act's definition of financial record information; its restrictions on the supervisory agencies' access to records, and the Act's restrictions on their referral power.

---

[3] Section 1101(6) of the Act defines "supervisory agency" to mean:

with respect to any particular financial institution any of the following which has statutory authority to examine the financial condition or business operations of that institution—

(A) the Federal Deposit Insurance Corporation;
(B) the Federal Savings and Loan Insurance Corporation;
(C) the Federal Home Loan Bank Board;
(D) the National Credit Union Administration;
(E) the Board of Governors of the Federal Reserve System;
(F) the Comptroller of the Currency;
(G) the Securities and Exchange Commission;
(H) the Secretary of the Treasury, with respect to the Bank Secrecy Act and the Currency and Foreign Transactions Reporting Act (Pub. L. No. 91–508, title I and II); or
(I) any State banking or securities department or agency.

[4] *See, e.g.,* 18 U.S.C. §§ 656–657, 1005–1006.

The supervisory agencies are authorized by statute to examine the affairs of financial institutions under their jurisdiction.[5] The examining function has included reporting to the Department of Justice irregularities that may amount to violation of the criminal statutes applicable to financial institutions.[6] These statutes were originally enacted as part of the Federal regulatory system for financial institutions. Their purpose is to protect the solvency and integrity of the institutions against willful misuse of their funds.[7] It was considered an integral part of the supervisory agencies' duty to protect financial institutions and their depositors to inform the proper law enforcement authorities of those instances of mismanagement that appeared to be criminal. As stated in *Cooper* v. *O'Conner*, 99 F. (2d) 135, 140 (D.C. Cir. 1938):

> By reason of their performance of duties clearly assigned, the facts and evidence which suggest criminal conduct upon the part of bank officials are revealed to such [Federal] officers. It is the duty of all citizens to reveal such evidence, of which they may have knowledge, at the risk of being guilty of misprision of felony for failing to do so. In the case of an official, his failure to act under such circumstances would in addition, constitute serious malfeasance in office. In the present case, appellees were charged with responsibility for the collection and conservation of the assets of a bank. It would be absurd to contend that the duties of such an officer—so charged and so peculiarly aware of facts suggesting that certain persons were engaged in the spoliation of those very assets—should stop abruptly at the point where the initiation of criminal proceedings became necessary to protect such assets.

There was no statutory restriction on their power to report offenses. *See, Bank of America National Trust & Savings Assn.* v. *Douglas,* 105 F. (2d) 100, 103–104 (D.C. Cir. 1939); 29 Op. Att'y Gen. 555 (1912).

We must consider, then, the extent to which Congress has affected the previous power and duty of the supervisory agencies to report violations of law to this Department. The Act affects this power in three ways. First, §§ 1102 and 1113 restrict the conditions under which the supervisory agencies may obtain access to the records in the hands of the financial institution. Second, §§ 1112 and 1113(h) place express restrictions on disseminating information once access has been obtained. Third, § 1101(2) defines the term "financial record" broadly enough to include information derived from the primary records.

---

[5] *See, e.g.,* 12 U.S.C. § 481 (Comptroller of the Currency); 12 U.S.C. § 1440 (Federal Home Loan Bank Board); 12 U.S.C. § 1756 (National Credit Union Administration); 12 U.S.C. § 1730(m)(1) (Federal Savings and Loan Insurance Corporation); 12 U.S.C. § 1820(b) (Federal Deposit Insurance Corporation).

[6] *See* 18 U.S.C. §§ 213, 215, 656–657, 1005–1006.

[7] *See, e.g., United States* v. *Darby,* 289 U.S. 224 (1933); *United States* v. *Corbett,* 215 U.S. 233 (1909); *United States* v. *Manderson,* 511 F. (2d) 179 (5th Cir. 1975); *United States* v. *Wilson,* 500 F. (2d) 715 (5th Cir. 1974); *Weir* v. *United States,* 92 F. (2d) 634 (7th Cir. 1937).

Initial access by a Government agency to records in the hands of a financial institution is governed by § 1102. It prescribes the general requirement that access must be obtained through one of the formal methods set out in §§ 1104–1108, subject to notice to the customer and to judicial supervision under §§ 1109–1110. It further provides that, notwithstanding the general requirement, initial access may be obtained through the exceptions contained in §§ 1103(c)–(d), 1113, and 1114. Of these, § 1113(b) and (h) are relevant to the functions of the supervisory agencies.

Section 1113(b) provides:

> Nothing in this title prohibits examination by or disclosure to any supervisory agency of financial records or information in the exercise of its supervisory, regulatory, or monetary functions with respect to a financial institution.

This is intended to give the supervisory agencies access to customer records in order to conduct examination.

In addition, § 1113(h)(1)(A) permits a Government authority to have access to customer records in connection with a lawful examination, inspection, or investigation of the institution or of a legal entity not a customer.[8] The investigating agency must certify that the investigation is lawful; transfer of the primary records to another agency is restricted. § 1113(h)(2), (4). However, under § 1113(h)(5) the agency in possession may notify another agency with proper jurisdiction "that financial records obtained pursuant to this subsection may relate to a potential civil, criminal, or regulatory violation by a customer," and the notified agency may then seek access under the procedures provided by the Act. By its terms, § 1113(h)(1)(A) may be used as authority to examine a financial institution, thereby expressly permitting a supervisory agency to notify a law enforcement agency under § 1113(h)(5). We are informed, however, that the supervisory agencies prefer to obtain access under § 1113(b) in order to avoid the certification process required by § 1103(b) and § 1113(h)(2).

Unless one of the exceptions in § 1113–1114 applies, § 1112 of the Act provides the mechanism for disseminating financial records obtained from the acquiring agency to other agencies. Under subsection (a), the transferor agency must certify that the records are relevant to a legitimate law enforcement inquiry within the jurisdiction of the recipient agency. Under subsection (b)–(c), the transferor must notify the customer within 14 days unless a court authorizes delayed notice.[9] Subsection (d) expressly excludes from the Act's restrictions the exchange of information among supervisory agencies.

---

[8] This means, in effect, a partnership of more than five individuals or a legal person not an individual. *See* note 2, *supra*.

[9] The reasons justifying delayed notice provided by § 1109(a)(3) are:

(3) there is reason to believe that such notice will result in—

(Continued)

As reported to the House, § 1112 of the Act provided:

> Nothing in this title prohibits any supervisory agency from exchanging examination reports or other information with another supervisory agency, *or from supplying information to a prosecution or enforcement agency concerning a possible violation of a regulation or statute administered by the supervisory agency.* [Emphasis added.][10]

This language would have expressly continued the existing referral practices of the supervisory agencies for offenses relating to the financial institution. It was deleted when the present § 1112 was introduced in an amendment offered by Representatives Goldwater and McKinney.[11] The effect of the amendment, Representative Goldwater explained, "is to force an agency to justify beforehand its request for information, leave a paper trail of the transaction, and only upon court agreement not notify an individual."[12] Representative McKinney introduced a letter from Assistant Attorney General Wald supporting the amendment; the letter did not distinguish referrals by supervisory agencies from other interagency transfers.[13]

The term "financial records" is defined by § 1101(2) of the Act to include "an original of, a copy of, *or information known to have been derived from*" any record held by a financial institution concerning its relationship with a customer. [Emphasis added.] The emphasized language was added on the House floor in an amendment by Representative Pattison, but is not discussed in the legislative history.[14] On its face, it is broad enough to include both summaries of customer records and analyses of the records showing that the customer may have engaged in any particular activity, including commission of a crime.

There are several reasons for a broad reading of this language. First, one principal purpose of the Act was to restrict the ability of the Government to reconstruct an individual's affairs from his financial records.[15] Derived information and its use are at the center of what Congress considered to be the threat to privacy under prior law. Second, §§ 1103(c)

(Continued)

      (A) endangering life or physical safety of any person;

      (B) flight from prosecution;

      (C) destruction of or tampering with evidence;

      (D) intimidation of potential witnesses; or

      (E) otherwise seriously jeopardizing an investigation or official proceeding or unduly delaying a trial or ongoing official proceeding to the same extent as the circumstances in the preceding subparagraphs.

[10] 124 CONGRESSIONAL RECORD H. 11728 (daily ed., Oct. 5, 1978).

[11] 124 CONGRESSIONAL RECORD H. 11733, 11734 (daily ed., Oct. 5, 1978).

[12] 124 CONGRESSIONAL RECORD H. 11733 (daily ed., Oct. 5, 1978).

[13] 124 CONGRESSIONAL RECORD H. 11734 (daily ed., Oct. 5, 1978).

[14] 124 CONGRESSIONAL RECORD H. 11735 (daily ed., Oct. 5, 1978).

[15] *See* H. Rept. 1383, 95th Cong., 2d sess., at 33–35; 124 CONGRESSIONAL RECORD H. 11731–32 (Representatives Pattison, Rousselot), 11739 (Representative Cavanaugh), 11739 (Representatives Rousselot and Pattison), (daily ed., Oct. 5, 1978).

and 1113(h)(5) specifically permit a financial institution or a supervising agency to report to a law enforcement agency, in limited circumstances, that financial records show a crime may have been committed, without notifying the customer. This express grant of authority would not be necessary if the reports were not deemed to be disclosure of a "record" otherwise prohibited by the Act. Third, the Pattison amendment, as a whole, had the purpose of encouraging customers to seek judicial review and requiring agencies to justify access to records with greater particularity.[16] Although the scope of the phrase "information known to be derived from * * *" is not discussed, the phrase was enacted as part of an effort to make it more difficult for the Government to obtain or use financial information without notice to the customer.

The argument to the contrary is that the operation of § 1112 requires that a summary or analysis, if sufficiently general, need not be considered a "record." Representative Goldwater explained that § 1112's purpose was to require the agency receiving the financial information to justify its need.[17] The transferring agency is required to certify that the transfer is for a legitimate law enforcement purpose. To do so, the receiving agency must be able to explain to the transferring agency what it wants and why. This, in turn, requires that the transferring agency first have informed the receiving agency that it has available financial information that may be relevant to a legitimate law enforcement inquiry.

This argument, in our view, does not overcome the action of the House (under § 1103(c) and § 1113(h)(5)) in expressly permitting reports that a crime may have been committed and deleting similar express authority in § 1112(d). These actions would have been superfluous if such a report, based on examination and analysis of financial records, was not itself a record. It is consistent, moreover, with the Act's general purpose of limiting Government access to financial data to construe the statute to prevent one agency from informing another that an individual's financial records should make him an object of the latter's agency's suspicions without informing the individual. We therefore conclude that the definition of "financial record" in § 1102(2) includes a report that analysis of the primary records shows a customer to have possibly committed a crime.

Thus, the statement that a customer's records may relate to a Federal crime, when based on examination of those records, is itself a financial record under the Act. The Act expressly permits an agency that has obtained access to the primary financial records under § 1113(h) to notify a proper law enforcement agency of this conclusion, and it expressly permits transfer of any information among supervisory agencies. Otherwise, the procedures of § 1112(a)-(c) are the Act's only explicit mechanism

---

[16] 124 CONGRESSIONAL RECORD H. 11735 (Representative Pattison) (daily ed., Oct. 5, 1978).

[17] 124 CONGRESSIONAL RECORD H. 11733 (daily ed., Oct. 5, 1978).

for disseminating customer record information, including derivative information, from one agency to another. The question thus becomes whether Congress intended a further, implicit method of transfer from the supervisory agencies.

As a general matter, the legislative history of § 1112 is clear that implicit exceptions to it were not intended. The House was aware that the "routine use" exception to the Privacy Act, 5 U.S.C. § 552a(a)(7), (b)(3), has been used to justify exchanges of information among Federal agencies based on implicit authority. In an exchange among Representatives Rousselot, Pattison, and Cavanaugh on this point, it was clearly stated that § 1112, as amended, contained no "routine use" exception, and that interagency dissemination could only be made with certification by the transferring agency and notice to the customer.[18] Without equally clear support derived from the purpose and legislative history of the Act, we are unable to say that Congress intended to preserve as implied exceptions to § 1112 any pre-enactment practices of transferring information.

We believe, however, that support for implied authority to transfer information can be found in the narrow circumstances in which the offense reported by a supervisory agency relates to the financial institution's operations. Representative Goldwater stated that his version of § 1112 did not apply "to supervisory agencies properly conducting their responsibilities."[19] The proper conduct of those responsibilities has long been considered to include reporting criminal violations of the banking laws to the law enforcement agencies.[20] Moreover, the Right to Financial Privacy Act was but one title of 20 in an omnibus statute that was primarily concerned with strengthening the powers of the supervisory agencies and tightening the restrictions on bank officers, directors, and shareholders.[21] The House Banking, Finance, and Urban Affairs Committee relied in at least one case on referrals from a supervisory agency to U.S. Attorneys as indications that a regulatory problem existed.[22] It would be anomalous to conclude that a statute intended on the whole to strengthen the regulation of financial institutions was also intended to deprive the regulators of one of their oldest and strongest weapons for dealing with the most serious cases of management abuse.

Considering the Financial Institutions Regulatory Act as a whole, we conclude that Congress did not intend to prohibit a supervisory agency from reporting to the proper law enforcement agency that it has discovered in a customer's records evidence that a criminal statute that is part

---

[18] 124 CONGRESSIONAL RECORD H. 11739 (daily ed., Oct. 5, 1978).

[19] 124 CONGRESSIONAL RECORD H. 11733 (daily ed., Oct. 5, 1978).

[20] *See* p. 4, *supra.*

[21] *See generally* Pub. L. No. 95–630, Financial Institutions Regulatory and Interest Rate Control Act of 1978, Titles I-III, IV, VI-IX, 92 Stat. 3461; H. Rept. 1383, 95th Cong., 2d sess., at 4–22 (1978).

[22] H. Rept. 1383, 95th Cong., 2d sess., at 13 (1978).

of its regulatory system has been violated. Such reports are an integral part of the process of regulating financial institutions, and they further the regulatory agencies' primary mission of protecting the soundness of these institutions. Notwithstanding § 1112, the supervisory agencies have implicit authority to inform the proper law enforcement agency that their inspection of customer records shows that an individual may have violated a criminal statute governing the management of financial institutions they regulate.

We must, however, point out that the contrary argument is strongly grounded on the language and legislative history of the Act. We cannot say with certainty that the courts would not conclude that a supervisory agency that has obtained access under § 1113(b) must give notice under § 1112 even when reporting evidence of a crime relating to the management of the institution. Furthermore, we are not aware of anything in the language or legislative history of the Act that would lead to the conclusion that supervisory agencies have implied authority to report that crimes unrelated to their supervisory function may have been committed on the basis of an analysis of a customer's financial records.

The next question is the scope of the information that may be included in a report to a law enforcement agency under § 1103(c) or § 1113(h)(5), or in a report under the supervisory agencies' implied authority. These provisions permit notice to be given so that the law enforcement agency may then seek access to the records under the formal provisions of the Act, which require customer notice.

The permissible scope of referral therefore lies somewhere between two poles. On the one hand, a report cannot be so detailed as to effectively substitute for access to the records themselves. This would permit the formal access procedures to be bypassed.[23] On the other hand, the report must be sufficiently detailed in order to inform the law enforcement agency that reasonable grounds exist to believe that an individual has violated the law. Since the referral provisions contemplate access under the Act, it would be reasonable to identify the records and provide an explanation in sufficient detail to permit the law enforcement agency to support a formal proceeding for access. This requires a written statement giving a "demonstrable reason" to believe that the records are relevant to a legitimate law enforcement inquiry.[24] While the legislative history is silent on the amount of detail that must be provided, the language of § 1110(c) clearly contemplates a factual showing beyond mere conclusions. We suggest that this middle ground would be occupied by a description of the pattern of transactions shown in the customer records that does not discuss

---

[23] Indeed, § 1113(h)(4) explicitly forbids transfer except to facilitate investigation of the institution or a legal entity not a customer.

[24] Act, § 1110(b)–(c).

particular, identifiable transactions, coupled with the supervisory agency's analysis of why this may relate to a potential violation.

MARY C. LAWTON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*